## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ERIC PAUL LOHSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3022 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Eric P. Lohse appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Lohse filed a Motion for Summary Judgment (d/e 11). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16). This matter is before this Court for a Report and Recommendation. For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be reversed and remanded for further proceedings.

## STATEMENT OF FACTS

Plaintiff Lohse was born on December 8, 1958.  Lohse is an M.D. specializing in ophthalmology.  He completed a residency in ophthalmology in 1987 and a cornea fellowship in 1988.  He worked as an ophthalmologist and ophthalmic surgeon from 1988 until he stopped practicing on September 22, 2014.  Lohse suffers from degenerative disc disease in the cervical spine, degenerative joint disease in the right knee, arthritis in the left hip and a labral tear.  R. 27, 159, 171, 175.

On September 12, 2014, Lohse saw Dr. Bryan Albracht, D.O., for neck pain.  Lohse reported that he had been having neck pain for five years.  He played football in high school and had a motorcycle accident when he was 19.  The accident caused a whiplash-type injury, but x-rays at the time showed no fracture.  Lohse said he had hot burning pain in his neck, particularly when performing surgery or looking over a patient for prolonged periods.  Moving his head to certain positions temporarily relieved the pain.  Lohse did not have radicular pain, numbness, or tingling. He used Motrin over-the-counter occasionally for the pain.  He did not like to take medications routinely.  R 316.

On examination, Lohse had limited cervical range of motion and pain with rotation to either extreme and loss of motion with flexion, extension,

and rotation.  Spurling's test was positive, but the pain did not radiate to upper extremities.[1]  X-rays showed moderate degenerative changes at C5/C6 and C6/C7.  Dr. Albracht recommended physical therapy and also mentioned use of ice and heat, as well as continued use of Motrin.  R. 317.

On September 17, 2014, Lohse saw physical therapist Judy Limper for evaluation.  Lohse rated his pain at 2 out of 10 but said that the pain went up to 6 or 7 out of 10.  He had stomach issues with taking Motrin because NSAID medication bothered his stomach.  He ran three days a week and performed a home exercise program.  The running did not increase his symptoms of neck pain.  When driving, he no longer turned his head when backing up and his symptoms were worse on days he performed surgery.  R. 314.

On examination, Limper noted increased myotension in the cervical paraspinal and upper trapezius muscles.[2]  Lohse had point tenderness at C7.  Limper used traction in the supine position and provided Lohse with an over-the-door home traction unit and instructed him on how to use it.  Limper also instructed Lohse on certain exercises and recommended

---

[1] Spurling's maneuver is a test for radiculopathy in which the physician presses down on the head while the patient rotates the head laterally.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1900.  Radiculopathy is a disease of the nerve root such as from inflammation or impingement.  Dorland's, at 1571.
[2] Myotension is tension of the muscles.  See Dorland's, at 1221,1226.

3:19-cv-03022-SEM-TSH   # 17   Filed: 04/14/20   Page 4 of 29

continuing the exercises, using the home traction unit, and using ice packs. R. 314.

On September 24, 2014, Lohse saw Dr. Albracht. Lohse decided to stop working due to his neck pain. He asked Dr. Albracht to complete a form entitled Attending Physician Statement of Functionality. Dr. Albracht stated, "He simply cannot continue ocular exams and ophthalmic surgeries due to increasing frequency, severity, and duration of his neck pain. He has given this a lot of thought and he is absolutely sure he will not being (sic) going back to this field of medicine. It has been a difficult decision, but he is really resolute." R. 312.

Lohse said the traction provided relief for about two to three hours. He denied any radiating pain and said his pain was between 1/10 and 3/10 with increases in pain up to 8/10 two or three times a day. Changing positions relieved the pain. Dr. Albracht recommended four to six weeks of physical therapy. Dr. Albracht recommended against performing further surgeries or slit-lamp exams. These activities caused repetitive stress that aggravated Lohse's pain. Dr. Albracht mentioned performing an MRI. Lohse said he wanted to avoid surgical options. R. 313.

On November 7, 2014, Lohse saw Dr. Albracht for a recheck. Lohse said that the NSAID meloxicam definitely helped with the pain, but he did

Page **4** of **29**

not want to take it routinely because he noticed some bloating after taking the medication for five days.  Lohse said that physical therapy increased his pain.  Traction at home helped with the pain.  R. 307-08.  On examination, Lohse had decreased cervical range of motion and was limited with flexion of the neck.  Spurling's test results were equivocal.  Dr. Albracht recommended continuing with traction, physical therapy exercises at home, and intermittent use of meloxicam.  R. 308.

On December 22, 2014, Lohse had an MRI of his cervical spine.  The MRI showed at C5-6 moderate spondylosis with cervical degenerative disc disease, with disc osteophyte changes, thickening of the posterior ligaments and narrowing of the interspinous process regions; moderate spinal stenosis with mild cord flattening; and significant bilateral foraminal narrowing.  The MRI also showed at C6-7 degenerative spondylosis to a lesser extent.  R. 354.

On December 24, 2014, Lohse saw neurosurgeon Dr. Brian Russell, M.D., for a consultation.  On examination, Lohse had good strength and tone and his sensation was intact throughout.  Dr. Russell stated that Lohse's x-rays and MRI showed significant progressive degenerative disease at C5-6 and Lohse had developed a subluxation.  Lohse had some significant disease at C6-7 with some mild C 6 root symptoms.  Dr. Russell

said that Lohse could not take long-term NSAID medication because he had GERD; Lohse maximized his exercise and workout; and Lohse modified his work environment to improve his quality of life and symptoms, but he still had worsening symptoms.  Dr. Russell said he could not recommend surgery given Lohse's condition and that Lohse would need to limit his activities.  Dr. Russell said that using a microscope for extended periods necessary for Lohse's work as an ophthalmologist and ophthalmic surgeon would aggravate his symptoms.  Dr. Russell said to contact him if Lohse experienced radicular pain and recommended continuing exercises for flexibility and core strengthening.  R. 305.

On December 31, 2014, Dr. Koteswara Narla, M.D., performed an EMG nerve conduction study on Lohse.  On examination, Lohse had difficulty turning his head.  No serious sensory or motor deficits were noted and no sign of muscle wasting.  The EMG nerve conduction study suggested cervical paraspinal muscle irritation arising from the nerve root. Dr. Narla concluded, "I do agree with him that perhaps continuous looking under the microscope certainly would significantly hasten up the progression of degenerative changes and also perhaps development of any cervical myelopathy in the near future."  R. 301.  Dr. Narla, however, stated

that the studies showed no current myelopathy symptoms and the MRI showed no signal cord changes.  R. 302.[3]

On February 24, 2015, Lohse saw Dr. Russell for a follow up after the EMG nerve conduction studies.  Lohse reported that nothing had changed. He noted that he had pain at the base of his neck and his arm went to sleep at night.  R. 298.  Dr. Russell said the EMG nerve conduction studies showed no specific evidence of root compromise but some irritation in the paraspinal muscles.  Dr. Russell noted that the x-rays and MRI in the records showed significant degenerative changes.  Dr. Russell concluded:

> RECOMMENDATIONS: Unfortunately, this has gotten progressively worse on him probably over about a 5-year span. He has tried therapy, tried medications, none of which have really helped provide much benefit. He has reached the point that he is unable to continue to work on the microscope on a regular basis. He is going to continue with his exercises, stretching, nonsteroidals to try and assist with his pain control. If he starts to get any significant radicular component, which he is trying to head off, he can certainly contact me. At this juncture I would support his inability to return to full-time work.

R. 299.

On April 9, 2015, Lohse saw physical therapist Theresa Delvo, PT, for a Functional Capacity Evaluation (FCE).  R. 260-67.  Lohse reported that he had gradual onset of neck pain since 2009.  The pain increased

---

[3] Myelopathy is pathological changes in the spinal cord.  See Dorland's, at 1220.

while he performed surgery. Lohse acquired adjustable equipment to alter his work environment and he actively changed his posture to affect his pain. Two years prior to the evaluation his symptoms became worse and he had pain daily with normal activities. Lohse experienced pain in his cervical region, without radiation into the arms. He put his pain at 3 out of 10. Lohse stopped performing surgeries because the pain interfered with his ability to complete the procedures, "My concern is the patient because I don't always have the opportunity to stop in the middle of surgery." Lohse explained why he stopped other aspects of his ophthalmology practice, "When I'm in the office/clinic, it's just a pain but why would I keep hurting myself? Research documents Ophthalmologists are dealing with repetitive stress injuries and I've been practicing for >30 yrs." R. 262.

Movement generally helped relieve Lohse's pain, but certain movements made the pain worse, such as moving his arms overhead or making quick movements playing basketball. Sitting bothered Lohse's pain more and he estimated that sitting for less than 30 minutes performing paperwork or computer work bothered his neck. Sitting still resulted in increasing neck pain over time, "[Sitting still] doesn't do it instantly but each hour that goes on, it gets worse." R. 262. Lohse said his pain varied from 3 out of 10 to 8 out of 10 depending on his activities. His arms fell asleep

at night while in bed.  Lohse said that he had no problems with lifting, carrying, pushing, or pulling and he had been performing core strengthening exercises for 10 years.  Lohse could perform yardwork.  He performed eight hours of yardwork the day before the evaluation, but his pain increased after he completed the work.  He also sometimes dropped objects.  R. 263.

Delvo conducted the examination.  Delvo concluded Lohse could perform medium work generally.  She found that his pain precluded him from performing the essential function of Lohse's work as an ophthalmic surgeon which required sitting still for extended periods:

> The position of his head, neck and upper trunk is an erect, static posture during surgery while performing fine motor, with unsupported arms. Client tolerated surgery simulation ranging between 7:20 -12:31 minutes which is less than required for Cataract surgery (estimating 20 min), Lasik surgery (estimating 20 minutes to do both eyes and up to 30 eyes/day) and Pterygum surgery is estimated to be 1.5 hrs.

R. 263.[4]

On July 22, 2015, Lohse saw Dr. Albracht.  Lohse reported that one of his disability insurance policies "did go through" and he was waiting for a resolution with the other one.  Lohse said his pain was unchanged and he had problems sitting during long car rides or sitting at the computer.  Lohse

---

[4] The pterygium is an abnormal fold of membrane attached to the cornea.  See Dorland's, at 1551.

got up after sitting for 30 minutes.  He did not have radicular pain during the day but had tingling in his arms while sleeping.  On examination, Lohse had decreased range of motion in his neck in rotation, flexion, and extension. Spurling's maneuver was positive.  Lohse had 5/5 muscle strength.  Dr. Albracht recommended continued use of Advil when necessary and continued range of motion exercises provided during his physical therapy sessions.  Dr. Albracht said to avoid activities with prolonged immobility.  R. 294.

On or about July 23, 2015, Lohse completed a Work History Report form.  R. 184-91.[5]  Lohse reported that he worked as an ophthalmic surgeon/ophthalmologist from July 1988 to September 2014.  Lohse worked 12 hours a day.  He worked 70 to 80 hours a week until 2004, then 60 hours a week until 2009, then 45 hours a week until he stopped working in 2014.  Lohse said in performing his work, he walked for 30 minutes a day; stood for 30 minutes a day; sat for eight hours a day; stooped for two hours a day; crouched for 30 minutes a day; reached for two hours a day; and typed or handled small objects for eight hours a day.  He lifted patients in and out of wheelchairs and pushed wheelchairs several times a day.  For a majority of the time, he held small surgical or diagnostic instruments in

---

[5] The form is undated.  The Index of Exhibits indicates that the form was completed on July 23, 2015.

front of him while looking through a microscope.  He had to hold his head still while looking through the microscope.  Lohse said the heaviest weight he lifted was over 100 pounds.  He frequently lifted over 10 pounds. R. 185.

On September 24, 2015, state agency physician Dr. Prasad Kareti, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 83-85.  Dr. Kareti opined that Lohse could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and frequently crawl.  R. 93-93.

On December 4, 2015, state agency physician Dr. Charles Kenney, M.D., prepared another Physical Residual Functional Capacity Assessment.  R. 91-93.  Dr. Kenney opined that Lohse could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and frequently crawl.  R. 93-93.

On January 21, 2016, Lohse saw Dr. Albracht.  Lohse reported difficulty with the treatment of his insurance claim by his second disability insurance company.  He reported continued daily pain and that he did his physical therapy exercises.  He could not tolerate NSAID medications due

to the effect on his stomach.  Prolonged sitting aggravated his pain.  His hands fell asleep at night while sleeping.  R. 364.

Lohse also reported that he twisted his right knee and felt it buckle. The knee had been swollen and very painful for a few weeks.  Lohse said he had a history of an ACL tear and also had problems with his left hip. He was lifting a heavy object and felt a sharp pain in his left groin and felt something pop.  The pain had improved since the incident.  On examination, Lohse had decreased range of motion in his neck and a positive Spurling's maneuver.  R. 364.

On February 24, 2016, Lohse saw Dr. Russell for a follow up on his neck pain.  Dr. Russell noted that Lohse had "rather severe cervical spondylosis."  On examination, Lohse had good strength in his deltoids, biceps, triceps, and wrist extensor muscles.  Dr. Russell told Lohse to continue with his exercises to strengthen his neck muscles and trapezius muscles and to return if his condition worsened.  R. 370.

On March 10, 2016, vocational expert Bob Hammond, MA, ABVE, prepared a Vocational Report on Lohse.  R. 237-42.  Hammond opined Lohse could perform light work that would allow him to change positions every 20 minutes.  Hammond opined that Lohse could not return to his prior work as an ophthalmologist:

Dr. Lohse will not be able to return to his previous position as an Ophthalmologist. He is unable to maintain a static position with his head while performing surgery and while looking through a microscope. He is also not able to maintain a seated position for periods of time to prepare reports, read medical records, and also doing other computer related tasks. He has to move about and change positions every 20 minutes, and pain would increase throughout the day the more times he would return to computer after breaks. . . . The FCE shows some activity at the medium level of return to work, but because of the need to alternate his position every 20 minutes and not maintain a static position, this would reduce to some light but mostly sedentary levels of return to work.

R. 242.[6]

On August 11, 2016, Lohse had an MRI of his left hip. The MRI showed mild left osteoarthritis and small left labral tears. R. 398.

On September 8, 2016, Lohse saw orthopedic specialist Dr. Benjamin Domb, M.D., for evaluation of his left hip. Lohse said he hurt his hip two years earlier while lifting a large stone. The hip pain had been worse since January 2016. Getting in and out of cars and bending forward caused sharp pain and he felt a dull pain throughout the day. Lohse said NSAID medication helped the pain, but he could not take NSAID because of the effect on his stomach. He reported popping and snapping with hip movements and pain with sitting. Lohse still ran three times a week and

---

[6] Hammond also opined that Lohse did not have transferable skills. R. 242. The Administrative Law Judge (ALJ) determined that Lohse could return to his prior work, and so, did not reach the issue of whether Lohse had transferable skills to perform other types of work. See R. 30-31.

played golf.  Lohse had no left hip pain at the time of the office visit.  R. 388.  X-rays showed mild arthritic changes.  Dr. Domb found that the August 8, 2016 MRI showed a large anterior superior labral tear with cartilage damage without full-thickness defects.  R. 390.  Dr. Domb said that Lohse would be a candidate for arthroscopic surgery, but he recommended that Lohse wait as long as his daily symptoms were still tolerable.  R. 391.

## THE EVIDENTIARY HEARING

On May 16, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 39-79.  Lohse appeared in person with his attorney.  Vocational expert Albert Walker also appeared.  R. 41.

Lohse testified first.  Lohse said he drove five times a week.  He had problems driving long distances.  He said, "It's just how, a function of time.  The longer I sit still, the more sore I get and my neck gets, my hip and actually, yeah, my Achilles tendon, too, but so all three.  So after 20 minutes of sitting still that's when I start to have pain."  If Lohse continued to sit for an hour, he had pain that night and the next day. His primary pain was in his neck.  R. 43-44.  Lohse also had numbness and tingling at night and he dropped instruments while performing surgery.  He stopped practicing after he dropped instruments three times in one surgery.  R. 57.

Lohse did not get muscle spasms in his neck, but he did get spasms in his mid-back.  He sometimes got sharp pain in his neck like a hot pencil being stuck into his neck.  R. 68.  Lohse said that Dr. Russell did not recommend any surgical options for his neck.  R. 58.

Lohse said that his neck hurt all day.  The pain was usually a 3 out of 10 and sometimes went up to 8 out of 10.  He could not concentrate when his pain was above 5 or 6 out of 10.  R. 62.

Lohse started experiencing pain in 2009.  Over time he cut his hours from 80 hours a week down to 45 hours a week before he quit working.  R. 44.  He saw 50 patients a day when he stopped practicing.  R. 69.

Lohse testified to the difficulty he had working with the pain:

> [A]s a cornea surgeon besides, and a general ophthalmologist I did a lot of cataracts and then we would do corneas, in addition, whenever they became available, so nights, weekends, evenings. And those are long surgeries for hour or two. And when you do it, when you're an ophthalmologist the surgery is, you just have to have your eyes in the, within a millimeter of the center of the eyepiece and then you just have to hold there and then your, all your movements are like this.  So you sit hour after hour and day after day.  And yeah, I became aware in 2009 when I was starting to have problems with my neck.

R. 45.  Lohse changed tables and equipment in the operating rooms to minimize the effects of the prolonged sitting and also modified his office. When seeing patients in the office, Lohse would go from examination room to examination room every 15 to 20 minutes.  R. 77. During examinations,

Lohse primarily used a device called a slit lamp to examine patients'
corneas.  When using the slit lamp, Lohse again had to sit and look through
eye pieces of a microscope to examine the cornea.  He also used an
indirect ophthalmoscope, which was a hat with a special light and lens to
examine eyes.  He also used a hand-held device called a direct
ophthalmoscope.  These devices required Lohse to hold his head still
which again caused pain.  He changed the layout of his equipment to be
better ergonomically to reduce his pain.  He also minimized his typing by
using scribes to type his notes as he dictated them.  R. 46-48, 77.

Lohse changed his practice in the early 2000s.  His back was sore
from performing cornea surgeries.  He started an exercise program and
switched away from cornea transplant surgery to cataract and LASIK laser
eye surgery. The surgeries were much shorter procedures, 20 minutes for
cataract surgery and 10 to 15 minutes for LASIK laser surgery.  R. 49.

The ALJ asked Lohse if he considered other work in the medical field.
Lohse said he considered other options, but he did not think he could
perform any of them.  He considered consulting, but decided against it
because he could not sit and read for extended periods or work at a
computer for extended periods:

Yeah.  I thought about consulting. I didn't, I looked into it a little
bit  . . . .  I would love to be able to do research. There was

Page **16** of **29**

some research I want to do, but sitting at my computer is very
uncomfortable because I have to, you know, sit still. I move
around, but after 20 minutes I just can't do it or 30 minutes
sometimes. . . .  [A]s a consultant I would think I'd have to be
reading a lot. I don't, I just don't even read books and that's,
and I love to. I read, I'll skim the newspaper and but it's hard to,
it's not really fun to read a book when you can only do it 15
minutes at a time and then you kind of lose your place.

R. 51-53.  Lohse said he could not practice in another area of medicine

because he was so specialized.  R. 53.   He also would not be efficient in

some other type of office practice because he would need to take extra

breaks and change positions regularly.  R. 66.

Lohse did not think he could perform eye examinations, also called

refractions, usually performed by optometrists because he would still need

to sit for extended periods of time.  He also did not know how to perform

refractions.  R. 65.

Lohse did not often use the traction device he got from physical

therapy.  He still regularly did the other physical therapy exercises for his

core, neck, and upper extremities.  R. 55.

Lohse said his knees did not hurt him currently.  His right Achilles

tendon hurt occasionally and he iced and stretched the Achilles tendon to

relieve the pain.  R. 56.  His left hip hurt and popped when he walked up an

incline or upstairs.  His hip hurt at night after he walked up an incline or

stairs.  Lohse's left hip did not hurt otherwise.  R. 56.  Lohse said his neck,

Achilles tendon, and hip hurt him while sleeping.  He changed positions about every 20 minutes while sleeping at night.  R. 59.

Lohse quit running.  He used an elliptical exercise machine instead. The machine was better for his hip and Achilles tendon.  Running did not affect Lohse's neck.  He cut back on playing golf and, as of the date of the hearing, May 16, 2017, he played once in 2017.  Playing golf irritated his neck.  He still did yardwork but broke up the work into shorter sessions. R.64.

Vocational expert Walker then testified.  Lohse stipulated to Walker's qualifications as a vocational expert.  R. 72.  Walker identified Lohse's past work as that of an ophthalmologist, identified with Department of Labor's Dictionary of Occupational Titles (DOT) code of 070.101-058.  R. 73.  The ALJ asked Walker the following hypothetical question:

> Mr. Walker, I'd like you to consider an individual of the claimant's age education and work experience. State agency consultants refer to an individual who is limited to the exertional, essentially limited to the exertional requirements of light work. This individual can climb ladders, ropes, scaffolds no more than occasionally and crawl no more than frequently. Would, with just those exertional and non-exertional limitations would that preclude past work that you've identified?

R. 73-74.  Walker opined that the person could perform Lohse's prior work as an ophthalmologist as described in the DOT, but Lohse could not perform the job as Lohse performed it as Lohse had described in the July

23, 2015 Work History Report form. R. 74.  The ALJ asked this follow-up

question:

> You heard the testimony today . I don't know if, if I ask you to
> assume that an individual would need to alternate position at
> least once every 30 minutes for at least a minute at a time, it
> could be either moving from sitting to standing, from standing to
> walking, from walking to sitting, but this individual could, would
> not be able to remain in one position for more than 30 minutes
> at a  time. Do you have an opinion about past work or any other
> work with that additional limitation?

R. 74-75.  Walker opined that the person would not be able to work as an

ophthalmologist if he had to move around that often.  R. 75.  The ALJ

followed up again:

> What about a doctor who sees a number of patients in different
> rooms and so they 're spending 20 minutes with - a patient and
> then they go from that room to another room and sees a patient
> for 10 minutes and then goes to another room?

R. 75.  Walker said that it would be possible for a person with the need to

move every 30 minutes to work as an ophthalmologist if that was the type

of practice the person had.  R. 75.  When asked by Lohse's attorney,

Walker opined that the person could not work as an ophthalmologist if he

had to change positions every 12 to 15 minutes. R. 75-76.  The hearing

concluded.

THE DECISION OF THE ALJ

The ALJ issued his decision on October 4, 2017.  R. 25-31.  The ALJ
followed the five-step analysis set forth in Social Security Administration
Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires
that the claimant not be currently engaged in substantial gainful activity.  20
C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to
have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,
Step 3 requires a determination of whether the claimant is so severely
impaired that he is disabled regardless of his age, education and work
experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this
requirement at Step 3, the claimant's condition must meet or be equal to
the criteria of one of the impairments specified in 20 C.F.R. Part 404
Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If
the claimant is not so severely impaired, the ALJ must determine the
claimant's Residual Functional Capacity (RFC) before proceeding to Step 4
of the Analysis.  20 C.F.R. §§ 404.1520(e), 416.920(e).

Step 4 requires the claimant not to be able to return to his prior work
considering his age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If
the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Lohse met his burden at Steps 1 and 2.  Lohse had not engaged in any substantial gainful activity after September 22, 2014, and he suffered from the severe impairments of degenerative disc disease in the cervical spine, degenerative joint disease in the right knee, and arthritis and a labral tear in the left hip.  R. 27.  The ALJ determined at Step 3 that Lohse's impairments or combination of impairments did not meet or equal a Listing.  R. 28.

At Step 4, the ALJ found that Lohse had the following RFC (RFC Finding):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) except he
> can climb ladders, ropes or scaffolds only occasionally and
> crawl no more than frequently.

R. 28.  The ALJ relied on the opinions of Drs. Kareti and Kenney to support

the RFC Finding, as well as the Delvo's finding that Lohse could perform up

to medium work.  The ALJ noted that Delvo also acknowledged that Lohse

could tolerate sitting still in a surgery simulation for 12 and a half minutes.

The ALJ also considered Lohse's activities of running and exercising.  The

ALJ gave little weight to Dr. Russell's February 24, 2015 statement that "I

would support his inability to return to full-time work" because the ALJ

stated that "the issue of disability . . . is reserved to the Commissioner."

The ALJ erroneously attributed the statement to Dr. Albracht.  R. 29-30.

At Step 4, the ALJ found that Lohse could perform his past work as

an ophthalmologist as that job is performed in the national economy.  The

ALJ relied on the RFC Finding and the opinion of vocational expert Walker.

The ALJ also stated that Lohse admitted that he could adjust his working

environment and his working hours to address limitations caused by his

impairments.  The ALJ further relied on the fact that Lohse was "also a

licensed medical doctor" and that, as such, "he has not submitted evidence

of any barrier to entry into general practice based on his education and

training."  R. 30.

The ALJ addressed Walker's opinion that Lohse could not perform his prior work, as generally performed in the national economy, if the Lohse had to change positions every 30 minutes:

> The undersigned recognizes that Mr. Walker testified that if an individual with the residual functional capacity assessment above also required an opportunity to change position for one minute every 30 minutes that individual could not perform the claimant's past work. However, the claimant had previously indicated that when he was not in surgery, he met with different patients in different waiting rooms every 20 minutes. This is inconsistent with Mr. Walker's opinion. Moreover, Mr. Walker acknowledged that he had no experience with vocational placement of a physician.

R. 31. The ALJ concluded that Lohse was not disabled.

Lohse appealed the decision of the ALJ. On November 30, 2018, the Appeals Council denied Lohse's request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Lohse then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (original version at 2016 WL 1119029, at *1 (March 16, 2016)) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

At Step 4 the ALJ found that Lohse could perform his past work as an ophthalmologist as that job is performed in the national economy. The ALJ relied on the RFC finding and the opinion of vocational expert Walker. The ALJ stated that this work does not require performance of work related activities precluded by the claimant's residual functional capacity. This was reversible error.

The ALJ did not include in his RFC evidence that Lohse had to change positions of his neck frequently to relieve his pain. However, the ALJ acknowledged physical therapist Delvo's tests which indicated Lohse could only hold his head still for 12:30 minutes in the position to perform eye surgery. Delvo, after testing, found that Lohse tolerated surgery simulation ranging for periods between 7:20 – 12:31 minutes. This was less than the time required for cataract surgery, Lasik surgery, or Pterygum surgery performed by Lohse in his past work as an ophthalmologist.

Vocational expert Walker testified that Lohse would not be able to work as an ophthalmologist if he could not remain in one position for more than 30 minutes. Walker further testified that a person could not work as an ophthalmologist if he had to change positions every 12-15 minutes. This substantial un-rebutted evidence shows that Lohse could not perform surgery.

The only evidence cited by the ALJ to address this issue was that Lohse indicated when he was not in surgery, he met with different patients in different waiting rooms every 20 minutes. R. 31.

Both the testimony of Walker and the opinion of the ALJ that Lohse could perform his past relevant work as an ophthalmologist as generally

performed in the national economy ignores the clear and unambiguous
language of Dictionary of Occupational Titles (DOT) Code 070.101-058
which includes in the work of an ophthalmologist both diagnosis and
treatment of diseases and injuries of the eyes <u>and</u> performance of surgery,
if indicated.[7] (emphasis added)  The use of the conjunctive "and" in the
description of an ophthalmologist's work clearly indicates surgery is a
required function of an ophthalmologist's work.

The evidence indicates that Lohse could not perform surgery.
Consequently, the opinion of Walker and the ALJ that Lohse could return to
his prior work as an ophthalmologist is contrary to the requirements of both
DOT 070.101-058 and the evidence.  The Commissioner takes
administrative notice that the DOT contains reliable job information. 20
C.F.R. §404.1566(d); SSR 00-4p, at 2 (same).

The ALJ's assertion that Lohse indicated he met with different
patients in different waiting rooms every 20 minutes (R.30) was not
inconsistent with Walker's opinion that an individual who would need an

---

[7] DOT Code 0701.101-058 states job requirements of an ophthalmologist as follows:  Diagnoses and treats diseases and injuries of eyes: Examines patient for symptoms indicative of organic or congenital ocular disorders, and determines nature and extent of injury or disorder. Performs various tests to determine vision loss. Prescribes and administers medications, and performs surgery, if indicated. Directs remedial activities to aid in regaining vision, or to utilize sight remaining, by writing prescriptions for corrective glasses, and instructing patient in eye exercises.

alternate position at least every 30 minutes would not be able to work as an ophthalmologist if he had to change positions every 12-15 minutes.

In addition to these problems, the ALJ erred in finding that Lohse had the burden to prove that he could not engage in the general practice of medicine.  R. 30.  Walker testified that Lohse's past relevant work was as an ophthalmologist, with a DOT code of 070.101-058.  R. 73.  The DOT categorizes the practice of ophthalmology as a different job from the general practice of medicine.  Compare DOT code 070-101.058, "Ophthalmologist," with code 070.101-022, "General Practitioner."  As noted above, the Commissioner takes administrative notice that DOT contains reliable job information.  20 C.F.R. §404.1566(d); SSR 00-4p, at 2 (same).  Based on the DOT, Lohse's past relevant work was as an ophthalmologist, not a general medical practitioner.  At Step 4, Lohse had the burden to prove he could not return to his past relevant work; he did not have a burden to prove he could not do other jobs.  In order to impose on Lohse the burden at Step 4 to prove he could not be a general practitioner, the ALJ would have to explain how, in apparent contradiction of the DOT, the job of ophthalmologist and general practitioner were actually the same job.  The ALJ failed to give such an explanation.

Assuming the DOT is reliable, the question of whether Lohse could perform some other job besides ophthalmologist was a Step 5 issue, not a Step 4 issue.  Step 5 concerns whether a claimant can perform some other work that exists in significant numbers in the national economy.  At Step 5, the Commissioner had the burden to present evidence that Lohse could perform other jobs that exist in the national economy.  20 C.F.R. § 404.1560(c).  Absent some explanation of why ophthalmologist and general practitioner were actually the same job, the ALJ improperly put a burden on Lohse at Step 4 to present evidence that he could perform another job that was not his past relevant work.   That was error.

Should the ALJ reach the question of whether Lohse could engage in the general practice of medicine on remand, the ALJ will need to: (1) explain how the jobs of ophthalmologist and general practitioner are the same job for purposes of Step 4 of the Analysis; or (2) address the issue at Step 5, not Step 4, which places the burden of producing evidence on the Commissioner, not Lohse.[8]

---

[8] The Commissioner raises additional reasons that Lohse is not disabled.  The Commissioner argues that Lohse failed to prove that the use of NSAIDs to control his pain "were either too dangerous to his health or themselves too functionally limiting to take the medications and still work."  Motion for Summary Affirmance (d/e 16), attached Memorandum in Support of Motion for Summary Affirmance (Commissioner's Memorandum), at 18.  The Commissioner also argues that Lohse failed to prove that he could not work part-time and still meet the Commissioner's threshold for engaging in substantial gainful activity.  Commissioner's Memorandum, at 19-22.  The Court does not consider these arguments because the ALJ did not base his decision on these grounds.  See Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 87-88 (1943);  Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Eric

Lohse's Motion for Summary Judgment (d/e 11) should be ALLOWED; the

Defendant Commissioner's Motion for Summary Affirmance (d/e 16) should

be DENIED; and the decision of the Commissioner should be REVERSED

and REMANDED pursuant to 42 U.S.C. § 405(g) sentence four.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   April 14, 2020


         s/ _Tom Schanzle-Haskins_
         TOM SCHANZLE-HASKINS
         UNITED STATES MAGISTRATE JUDGE

---

Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.").